# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# ALBANY DIVISION

| | |
|---|---|
| SHIRLEY GAINES, *et al.*, : | |
| : | |
| Plaintiffs, : | |
| : | CASE NO.: 1:63-CV-764 (WLS) |
| v. : | |
| : | |
| DOUGHERTY COUNTY BOARD : | |
| OF EDUCATION, *et al.*, : | |
| : | |
| Defendants. : | |

## ORDER

Presently before the Court is the Defendant Dougherty County Board of Education's (the "School Board") Motion for Declaration of Unitary Status and Entry of Final Judgment. (Doc. 46.) Therein, the School Board moves the Court to declare that the Dougherty County School System ("DCSS") has reached unitary status, vacate the outstanding injunctions, and enter final judgment. (Doc. 46.) The Plaintiff and Defendant classes have responded requesting that the Court grant the School Board's motion. (Docs. 47 & 48.) For the following reasons, the School Board's motion is **GRANTED**.

## BACKGROUND

This case was filed in 1963 as a class action on behalf of the named African-American students and their parents and on behalf of all other African-American children and their parents who were similarly situated in Dougherty County public schools to enjoin the district from racially segregating its schools. (Doc. 2 at 3-4.) In 1963, Plaintiffs' counsel argued:

> [T]hat the Dougherty County School Board set up two systems of schools here, one for whites and one for Negroes, and that those systems are maintained by the drawing of separate school zone lines for whites, whereby all white children are assigned to schools, and a separate system of zoning for all Negro schools, whereby all Negroes are assigned to Negro schools. The duty on the School Board here. . . is to do away with the dual school zone lines at the very minimum.

1

> . . . [W]hat you have is a separate system, an inferior system for Negroes and all Negro teachers assigned to Negro schools and principals and they even have a Negro supervisor. So, we say that the *Brown*[1] case requires the integration of those two systems.

Doc. 12-1 at 60. In 1963, the Court entered an order that DCSS desegregate, and it began supervising the desegregation process. (Doc. 2-1 at 82-83.) Subsequently, the Court issued further orders to effect the desegregation of DCSS. (*See* Orders dated May 23, 1978, June 28, 2979, and May 2, 1980.)[2] These orders required that the School Board obtain court approval of any plan to close, modify, or construct new schools and that the School Board implement a desegregation plan that would result in no school's student body deviating by more than 25% from a 50%-50% white-black student ratio.[3] (*See* Doc. 46-4.) When the desegregations plans were implemented in 1980, 45% of the students enrolled in DCSS were white and 55% of the students enrolled in DCSS were black. (Doc. 46-5.) As of November 18, 2019, 89% of the students enrolled in DCSS were black, 5.4% were white, and 5.6% were "other." (Doc. 45-1 at 2.)[4]

Because of the responsibilities placed on courts to protect the interests of class members, the Court previously denied without prejudice the School Board's prior motion to resolve this case so that the students classes could be reconstituted and their interests properly represented in this action. (*See* Doc. 13.) After counsel for the plaintiff and defendant classes informed the Court that they wished to continue representing their respective classes (Docs. 14 & 17), the Court issued a scheduling order on August 24, 2018 to proceed with the case and reconstitute the classes. (Doc. 19.) Several extensions of the scheduling order were granted, and on July 23, 2019, the Court heard from the proposed class representative for the White Class of Students, Dawn Guanciale, and thereafter, from the proposed class representative for the Black Class of Students, Prophete Joseph Charles. (*See* Docs. 38 & 43.)

---

[1] *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954).
[2] The Court through Judge Wilbur D. Owens, Jr. also required that a defendant white class of students be formed. *See* Order dated June 9, 1977.
[3] *See Anderson, et al. v. Dougherty Cnty. Bd. of Educ., et al.,* 609 F.2d 225, 226 (1980).
[4] The demographics of people working in DCSS are similar, with 83% being black. *Id.* at 3.

The Court found that both Ms. Guanciale and Mr. Charles had standing and would be appropriate class representatives and approved them as such in this case. (Doc. 44.)

On December 20, 2019, the School Board filed the instant motion for declaration of unitary status and entry of final judgment (Doc. 46), to which both classes responded without objection (Docs. 47 & 48). The Court then set a public hearing on the motion for Tuesday, March 10, 2020 and ordered the Parties to "notice any other interested persons or entities of the hearing, including the parents and staff of the Dougherty County schools, so that they may attend and, if desired, provide their opinions on the motion to the Court." (Doc. 49.) The Court allowed any supplemental information to be filed no later than March 17, 2020 (Doc. 54), but nothing further was filed.

## **ANALYSIS**

Following the U.S. Supreme Court's ruling in *Brown*[5] that school segregation violates the Equal Protection Clause of the Fourteenth Amendment, school boards such as the Defendant were "charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. Cty. Sch. Bd.*, 391 U.S. 430, 437-38 (1968).[6] Now, to be relieved of federal court supervision under a desegregation plan, a school board must show that it has "'complied in good faith with the desegregation decree since it was entered, and [that] the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.'" *Freeman v. Pitts,* 503 U.S. 467, 492 (1992) (citation omitted). In doing so, courts should look at six areas of a school system: (1) student assignments, (2) facilities, (3) faculty, (4) staff, (5) transportation, and (6) extracurricular activities. *Green v. County School Board of New Kent County, et at.,* 391 U.S. 430, 435 (1968). A court must examine these areas "applying the 'presumption that any current racial disparities in these areas are the result of the district's past unlawful conduct.'" *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1341 (11th Cir. 2005) (citation omitted). "The burden

---

[5] 347 U.S. 483.
[6] "Courts have used the terms 'dual' to denote a school system which has engaged in intentional segregation of students by race, and 'unitary' to describe a school system which has been brought into compliance with the command of the Constitution." *Bd. of Educ. v. Dowell*, 498 U.S. 237, 246 (1991).

3

then shifts to the school district to demonstrate that the racial imbalances are 'not the result of present or past discriminatory action on their part.'" *Id.* at 1338; *Freeman*, 503 U.S. at 494 ("The school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation."). But "the *Green* factors need not be a rigid framework," and they "may be related or interdependent." *Freeman*, 503 U.S. at 493, 497.

"[I]f the school district proves that demographic shifts have substantially caused any current racial imbalances in the school system, it will have satisfied its constitutional obligation to eliminate the vestiges of segregation to the extent practicable." *Holton*, 425 F.3d at 1341. "The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith." *Freeman*, 503 U.S. at 496. "Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors." *Freeman*, 503 U.S. at 494.

The School Board argues that it has maintained non-discriminatory policies and practices with respect to student enrollment, transportation, school construction and consolidation, student activities, and employment and that none of these have been conducted in a discriminatory manner. (Doc. 46-1 at 5-6.) Rather, the School Board asserts that any racial imbalances are "solely based upon factors outside of the control of Defendant Board and DCSS and not based upon any constitutional deficiencies." *Id.* at 6.

At the public hearing on the School Board's motion, Superintendent of DCSS Kenneth Dyer testified that the student population was now only 5.3% white and that compliance with the desegregation orders' requirement of a 50-50 ratio with a 25% deviation was mathematically impossible. He stated that since he graduated from DCSS, the county had become increasingly African American, which was a decision made by families. He said that there were an increased number of private schools and home schools, and that other families had simply left the county, resulting in the need to close several schools. He stated that there was nothing more DCSS could do to comply with the desegregation orders or to encourage families to enroll their children in DCSS. He further testified that court approval places a substantial burden on school operations primarily because the school district cannot make decisions efficiently. Counsel for the Plaintiff and Defendant classes had no questions for the

4

Superintendent and informed the Court that the class representatives discussed the motion with counsel and had no objection to the motion being granted.

The only objections raised to the motion were raised by relatives of the original Gaines plaintiff.[7] They objected to a final judgment being entered in this case, noting that they were concerned as to why the case was now being closed and that they wanted the Court to continue to oversee the school's operations in case former residents return. But they could not provide any evidence showing that discrimination continued in DCSS or that racial imbalances were the result of anything other than demographic changes in the county. As to a question they posed about whether black students could attend other schools, the Superintendent responded that magnet programs exist whereby students who want to attend a school outside of their zone can apply to do so without regard to race.[8] The record remained open for the filing of supplemental materials for one week after the hearing, and nothing further was filed. Indeed, nothing has been filed with the Court that suggests that a declaration of unitary status is inappropriate, and DCSS has met its burden.

DCSS has sought the Court's approval before closing or rezoning schools. *See, e.g.*, Docs. 6 & 10. The School Board has also annually filed reports with the Court which have shown a stark change in the demographics of Dougherty County and its schools since 1980. (*See* Docs. 12-1, 26, 45.) Thus, DCSS has acted in good faith to comply with the Court's orders. *See* Freeman, 503 U.S. at 496. The record shows that in October of 1980, DCSS had 9,160 white students and 11,393 black students. (Doc. 46-5.) But in November of 2019, DCSS had only 752 white students and 12,356 black students. (Doc. 45-1 at 2.) Indeed, census data shows that as of 2010 the City of Albany[9] was approximately 72% black and 25% white. (Doc. 12-2.) The Supreme Court has recognized that "[a]s the *de jure* violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial

---

[7] The Court note that these persons stated that they have nieces and nephews in DCSS, but they did not appear to be members of the current Plaintiff class because they did not indicate that they have children attending schools in DCSS.

[8] Although the objectors expressed concern about black students being able to attend one particular school in DCSS, the Superintendent explained that the specific school was more than 50% black, and that it had a magnet program through which other students could apply.

[9] Albany consists primarily of Dougherty County.

imbalance in a school district is a vestige of the prior *de jure* system." *Freeman*, 503 U.S. at 496. Now, forty years after the desegregation orders were adopted, it is clear that current racial imbalances in DCSS are not due to any *de jure* violations but are the result of demographic shifts outside of the School Board's control. "[T]o establish a *present* intent to discriminate, the burden rests with the Plaintiffs to demonstrate that the District acted with discriminatory purpose." *Holton*, 425 F.3d at 1349. There is no evidence before the Court indicating that the School Board is currently engaging in unlawful discrimination. *See Jacksonville Branch, NAACP v. Duval Cty. Sch. Bd.*, CASE NO. 85-316-Civ-J-10C, 1999 U.S. Dist. LEXIS 15711, at *218 (M.D. Fla. May 26, 1999) ("'While those charged with desegregation must not shrink from the threat of white flight, school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to those who vote with their feet.'") (citation omitted).

Furthermore, all procedural standards to conclude a class action have been met here. Before setting a briefing schedule on the School Board's motion, the Court confirmed that existing class counsel wished to proceed with representing their respective classes, and the Court reconstituted the classes by selecting appropriate class representatives after notice was provided to all parents and students of DCSS. (*See* Docs. 13, 14, 17, 19, 44.) The Court found that the class representatives "have standing in this matter as they are the parents or legal guardians of children currently attending and expected to continue attending schools in the DCSS." (Doc. 44 at 2.) The Court questioned both class representatives and found that they "are aware of the nature of this case, aware of their role and responsibilities as class representatives, and have agreed to work with class counsel to represent the interests of their respective class." *Id.* at 3; Fed.R.Civ.P. 23(a).

Furthermore, class members must receive reasonable notice of any step in the action and any proposed judgment, as well as before a court approves a settlement, dismissal, or compromise of a class action. Fed.R.Civ.P. 23(d)-(e). Here, Superintendent Dyer testified that a notice of the hearing was provided to all parents, students, faculty, and staff of DCSS through the parent portal and on the DCSS website. The local chapter of the NAACPP was also notified. Superintendent Dyer stated that communication with parents is typically done through the parent portal. Counsel for the School Board stated that he received one phone

6

call asking about the hearing, and in fact, that phone call was from Norma Gaines-Heath, a relative of the original Gaines plaintiff, who attended and spoke at the hearing. Thus, the Court finds that appropriate notice of the hearing was provided to the classes and other interested parties. Moreover, class counsel and the representatives fairly and adequately represented the interests of their classes. All Parties in this action are in agreement that the School Board's motion to conclude this case should be granted, and the Court finds that the same is supported by the record and applicable law.

Because the School Board has eliminated *de jure* segregation and has acted in good faith to comply with this Court's desegregation orders, the Court finds that a declaration of unitary status is appropriate and that this case should be closed. Countless courts have done the same. *See*, *e.g.*, *NAACP v. Duval Cty. Sch.,* 273 F.3d 960, 975 (11th Cir. 2001) (affirming finding of unitary status despite racially identifiable schools because "[t]he Constitution does not require a school board to remedy racial imbalances caused by external factors, such as demographic shifts, which are not the result of segregation and are beyond the board's control."); *Stell v. Bd. of Pub. Educ.*, 860 F. Supp. 1563, 1583 (S.D. Ga. 1994) ("Schools are either unitary or not in respect to student assignments, and a fear that a system may resegregate in the future, absent credible evidence to support those fears, does not justify a federal court's continued monitoring of the system."); *United States v. Bd. of Educ.*, Civil Action No. 679, 1995 U.S. Dist. LEXIS 4864, at *3 (S.D. Ga. Feb. 16, 1995) (granting unitary status because there was "no legal basis" to deny it).

Although the dissolution of this case is not taken lightly, it is appropriate and in the public's interest as "[l]ocal control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs." *Bd. of Educ. v. Dowell*, 498 U.S. 237, 248 (1991). Although DCSS no longer "requires court authorization for the promulgation of policies and rules regulating matters such as assignment of students and the like, [] it of course remains subject to the mandate of the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 250.

## CONCLUSION

Accordingly, for the foregoing reasons, the School Board's Motion for Declaration of Unitary Status and Entry of Final Judgment (Doc. 46) is **GRANTED**. The Dougherty County School System is declared unitary in all respects. All prior injunctive orders or decrees entered in this case are **VACATED**, and this action is **DISMISSED WITH PREJUDICE**. The Clerk is **DIRECTED** to enter judgment to that effect and close the file.

**SO ORDERED**, this  29th  day of April 2020.

                                             **/s/ W. Louis Sands**
                                             **W. LOUIS SANDS, SR. JUDGE**
                                             **UNITED STATES DISTRICT COURT**